Donald FITZGERALD, Delbert Eugene Hudson, Dilworth Menefele and Mario Youngblood, as individual plaintiffs and as representatives of the classes, Plaintiff,

v.

CITY OF LOS ANGELES, Chief of Police William Bratton and Captain Charlie Beck, in their individual and official capacities, and Does 1–10, in their individual and official capacities, Defendants.

No. CV 03–01876 DDP RZX.

United States District Court, C.D. California.

April 20, 2007.

Anne K. Richardson, Dan Stormer, Hadsell and Stormer, Pasadena, CA, Carol A. Sobel, Yvonne Tania Simon, Carol A. Sobel Law Offices, Santa Monica, CA, Mark D. Rosenbaum, Peter Bibring, Peter J. Eliasberg, ACLU Foundation of Southern California, Negin Mirmirani, Loeb & Loeb, Los Angeles, CA, for Plaintiff.

Bruce Monroe, Los Angeles City Attorney's Office Police Employment Law Sec, Cory M. Brente, Kelly N. Kades, Wendy C. Shapero, Los Angeles City Attorney's Office City Hall E-Police Litigation, Los Angeles, CA, for Defendants.

## ORDER GRANTING MOTION TO EXTEND INJUNCTION

PREGERSON, District Judge.

This matter is before the Court on Plaintiffs' motion to extend an injunction entered into between Plaintiffs and the City of Los Angeles pursuant to a settlement agreement. After reviewing the papers submitted by the parties and hearing oral argument, the Court grants the motion in the manner outlined below.

## I. BACKGROUND

### A. *Settlement History*

Plaintiffs are residents of Los Angeles who live in downtown Los Angeles in the area of the Central City known as Skid Row.[1] On March 18, 2003, Plaintiffs Donald Fitzgerald, Delbert Eugene Hudson, Dilworth Menefele and Mario Youngblood filed a complaint on behalf of themselves and similarly situated individuals challenging the conduct of the Los Angeles Police Department. (Declaration of Anne Richardson ("Richardson Decl."), Ex. 1.) Plaintiffs alleged that they were subjected to an unlawful policy, practice and custom of

---

1. The Settlement defines Skid Row as "that fifty-block area east of Downtown Los Angeles bordered by Third Street and Seventh Street, and Alameda and Spring Streets." (Richardson Decl., Ex. 2.)

harassment on the pretext that the police were seeking probation and/or parole violators or absconders. Plaintiffs further alleged that the policy was intended to, and did, create a climate of fear and intimidation among the poorest residents of Los Angeles in violation of their Fourth Amendment rights.

The matter was assigned to the Honorable Nora Manella, who issued a Temporary Restraining Order ("TRO") on March 31, 2003, enjoining Defendants from engaging in the conduct alleged by Plaintiffs and setting a hearing for a preliminary injunction. On April 14, 2003, Judge Manella issued a Preliminary Injunction identical to the TRO. Thereafter, the parties settled the case, and, on December 9, 2003, Judge Manella approved the settlement.

The settlement agreement constituted a stipulation to a permanent injunction as follows:

1. Officers will not conduct detentions or "Terry" stops without reasonable suspicion that a person is involved in criminal activity or has committed a crime or violated parole or probation. However, officers may continue to engage in consensual encounters with persons, parolees, probationers, or others residing in or otherwise present in the "Skid Row" area of Los Angeles.

2. Officers will not search the persons and/or possessions of those individuals stopped on the public streets and sidewalks of the "Skid Row" area of Los Angeles without probable cause and/or reasonable suspicion that the person has committed a crime or violated parole or probation. However, nothing shall prohibit officers from performing "pat-down" searches in accordance with the law.

3. Officers will not search residences of persons residing or otherwise present in the "Skid Row" area of Los Angeles except with a valid warrant, other legal justification, or with reasonable suspicion that they are on parole or probation and have violated the terms of their parole or probation.

(Richardson Decl., Ex. 2 at 2–3.) The settlement also provided that the injunction would remain in force for 36 months from the date on which it was signed by the court, and that:

Plaintiffs may move for an extension of the injunction upon a showing of good cause presented by way of motion filed within the last 120 days prior to expiration. The duration of the extension granted by the Court will be subject to the Court's discretion, but in any case will not exceed 36 months.

(*Id.* at 3.)

Finally, the settlement stated:

Notwithstanding this injunction, defendants will continue to be permitted to engage in law enforcement and other conduct necessary and appropriate measures to protect and promote the public safety and welfare and enforce and promote the laws of the State of California, the United States, and the City of Los Angeles. Nothing in this Agreement is intended to abrogate existing search and seizure law.... should the standard for detention and searches of parole or probationers be changed by the United States Supreme Court or the Ninth Circuit, this injunction will be modified by operation of law accordingly to incorporate the current legal standard.

(*Id.* at 3–4.)

B. *Instant Motion*

In November 2006, counsel for Plaintiffs allegedly learned that the police were purportedly engaging in a widespread practice of searching the residents of Skid Row,

and that the police were arbitrarily stopping, detaining, and searching individuals and groups of individuals who appeared to be homeless or to be residents of Skid Row, without any prior knowledge whether the person was on parole or probation and without any reasonable suspicion that the individuals were engaged in criminal activity. (Mot. 4:7–13.) Counsel for Plaintiffs also allegedly learned that, although such stops often included asking the subject whether he or she was on parole or probation, the search often continued regardless of how the person responded. (*Id.* 4:14–16.) Plaintiffs claim that police frequently detain and begin to search the subject before the subject is asked whether he or she is on probation. (*Id.* 4:16–18.)

Plaintiffs now move the Court to extend the injunction entered into as part of the prior settlement agreement.

## II.  DISCUSSION

### A.  *Timeliness of Plaintiffs' Motion*

As an initial matter, Defendants argue that Plaintiffs' motion was untimely filed. Pursuant to the terms of the injunction, December 9, 2006 was the latest date Plaintiffs could seek to extend the injunction. Plaintiffs submitted their motion to the Clerk's office on Friday, December 8, 2006. The motion was marked "lodged" and was not filed until Wednesday, December 13, 2006.

Plaintiffs did not fail to meet the deadline. The Clerk's office likely marked the motion as "lodged" instead of "filed" either because Judge Manella, who previously presided over the case, is no longer with the Central District, or because the case was technically "closed" at the time of the entry of the permanent injunction. But for the administrative procedures of the Clerk's Office, the motion would have been timely filed. Thus, the Court deems the motion timely.

### B.  *Procedural Filing Requirements*

Defendants also contend that Plaintiffs failed to comply with Local Rule 7–3, which requires parties to meet and confer before filing a motion. Plaintiffs claim that they did attempt to contact Defendants several times as soon as they decided to file the motion, and that they were given oral permission from Defendants to file their motion by the December 8, 2006 deadline. (Richardson Decl. ¶¶ 2–5.) They also argue that they could not have met and conferred any earlier because they only learned of the alleged violations in late November. (*Id.* ¶ 3.) Finally, Plaintiffs argue that, to the extent the purpose of Local Rule 7–3 is to allow nonmovants time to evaluate proposed motions and oppose or reach agreement in a considered fashion, Defendants have not been prejudiced because the Court's briefing schedule gave Defendants' more than adequate time to respond to Plaintiff's motion.

The Court understands that the unique time constraints in this case prevented Plaintiffs from meeting and conferring the required twenty days prior to the filing of the motion. The Court also understands that Plaintiffs' late notice to Defendants gave Defendants little time to familiarize themselves with this case before the December 8, 2006 deadline. (*See generally* Declaration of Kelly N. Kades.) However, due to the Court's management of its docket, Defendants had one month to respond to Plaintiffs' motion. Defendants took the full month to respond.[2] Accordingly, the Court finds that they have not been prejudiced by the Plaintiffs' actions.

---

2.  Upon receiving Plaintiffs' motion, the Court moved the original hearing date from January 8, 2007 to January 29, 2007. Defendants filed their opposition on January 12, 2007.

Therefore, while the Court has the power to strike Plaintiffs' motion for failure to comply with Local Rule 7–3, see, e.g., *Green v. Baca*, 226 F.R.D. 624, 656 n. 62 (C.D.Cal.2005), in the interest of deciding this case on the merits, it elects to hear the motion.

### C.  Plaintiffs' Burden: "Good Cause"

█ By the terms of the settlement, a court may extend the injunction for up to thirty-six months upon Plaintiffs' showing of "good cause." The term "good cause" is not defined in the injunction. Unsurprisingly, Plaintiffs and Defendants dispute the meaning of term "good cause" and the burden it requires Plaintiffs to satisfy before the Court may extend the injunction.

Defendants argue that the "good cause" showing is the same as that which would be required by Plaintiffs to obtain a permanent injunction in the first instance. By contrast, Plaintiffs contend that, had the parties intended to allow for an extension only upon a showing sufficient to justify a permanent injunction in the first instance, they would have stated so in the settlement agreement. Plaintiffs also argue that where a party is subject to an injunction, a single violation of that injunction can subject that party to contempt. Thus, Plaintiffs argue, it is logical that "good cause" for an extension is satisfied by a showing that Defendants have "engaged in anything more than an isolated instance or two of violations of the injunction." (Mot. 4:5–7.)

The Court finds that the requisite burden is less than that needed for a permanent injunction. By including the extension provision in the injunction, the parties likely intended that the "good cause" burden would not be the same as that required to obtain an injunction in the first instance.

At oral argument, the parties discussed the "good cause" requirement in more detail. Plaintiffs argued that the evidence submitted by Defendants undisputably proves that violations of the injunction have occurred. Defendants disagreed with this characterization of their evidence. After listening to the parties' arguments, the Court suggested that the best way to resolve the dispute would be to treat the motion as if it were a motion for summary judgment. The parties agreed to this interpretation of the good cause standard.

Thus, the Court will apply the same standard it would apply had the Plaintiffs moved for summary judgment: viewing the evidence in the light most favorable to Defendants, have violations of the injunction occurred? If so, the Court will extend the injunction for the amount of time it deems reasonable in light of the seriousness of these violations.

### D.  Whether The Evidence Establishes That Violations of the Injunction Have Occurred

Plaintiffs contend that the evidence they have submitted establishes that Defendants have violated the terms of the Settlement Agreement and the Fourth Amendment by conducting suspicionless detentions and searches of pedestrians in Skid Row without legal justification. Defendants disagree with Plaintiffs' characterization of current Fourth Amendment law and object to Plaintiffs' evidence. The Court will first discuss the current state of Fourth Amendment search and seizure law and then examine whether Plaintiffs' have proven, under a summary judgment standard, that Defendants have violated that law and the settlement terms.

### 1.  Search and Seizure Law Generally

The Fourth Amendment gives all citizens the right "to be secure in their persons ... against unreasonable searches and seizures...." U.S. Const. Amend.

IV. A warrantless search is only lawful under the Fourth Amendment if supported by probable cause. "Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Buckner,* 179 F.3d 834, 837 (9th Cir.1999) (quoting *United States v. Garza,* 980 F.2d 546, 550 (9th Cir.1992)).

By contrast, a *"Terry"* stop or investigative detention requires only reasonable suspicion that the detainee is engaged in criminal activity. *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). "To detain a suspect, a police officer must have reasonable suspicion, or 'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" *United States v. Michael R.,* 90 F.3d 340, 346 (9th Cir.1996) (quoting *United States v. Garcia–Camacho,* 53 F.3d 244, 245 (9th Cir. 1995)). To determine whether reasonable suspicion existed, the court must consider the totality of the circumstances surrounding the stop. *Id.* (citing *United States v. Hall,* 974 F.2d 1201, 1204 (9th Cir.1992)).

2. *Stops and Searches of Parolees and Probationers without Advance Knowledge of Their Parole or Probation Status*

■ Courts have recognized that probationers and parolees have a reduced expectation of privacy by virtue of search conditions imposed on them as a result of their probation or parole status. Indeed, in *Samson v. California,* —— U.S. ——, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006), the Supreme Court addressed the very issue giving rise to this motion—the legality of suspicionless parolee searches. After reviewing the legislative rationale for reducing parolees' expectations of privacy, the Supreme Court held that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Samson,* 126 S.Ct. at 2202.

However, *Samson* did not provide that *all* suspicionless searches of parolees are reasonable. Instead, the Supreme Court specifically noted that, "[u]nder California precedent ... an officer would not act reasonably in conducting a suspicionless search *absent knowledge* that the person stopped for the search is a parolee." *Id.* (citing *People v. Sanders,* 31 Cal.4th 318, 332–32, 2 Cal.Rptr.3d 630, 73 P.3d 496 (2003)) (emphasis added). In *Sanders,* the California Supreme Court explained that "a knowledge-first requirement is appropriate to deter future police misconduct and to effectuate the Fourth Amendment's guarantee against unreasonable searches and seizures." *Sanders,* 31 Cal.4th at 331–32, 2 Cal.Rptr.3d 630, 73 P.3d 496.

Since the *Samson* decision, the California Supreme Court has had the opportunity to revisit its "knowledge-first" requirement. In *In re Jaime P.,* 40 Cal.4th 128, 139, 51 Cal.Rptr.3d 430, 146 P.3d 965 (2006), the California Supreme Court held that where the "arresting officer had neither reasonable suspicion of criminal activity *nor advance knowledge* of a search condition that might have justified the search ... the totality of the circumstances amounts to very little and does not justify the officer's search." (emphasis added). With regard to the Supreme Court's *Samson* decision, the *In re Jaime P.* Court stated:

> *Samson* also appears to support minor's view that the high court approves of our *Sanders* holding requiring prior knowledge of the search condition as a protection against harassing searches. In *Samson,* Justice Stevens in dissent accused the majority of allowing law enforcement officers in California "unfettered discretion" to conduct parolee

searches. (*Samson,* supra, 547 U.S. at p. ——, 126 S.Ct. at p. 2207 (dis. opn. of Stevens, J.).) The *Samson* majority disagreed, responding that, under California law, suspicionless searches of parolees could not be conducted without prior knowledge of the person's parole status. (*Samson,* supra, 547 U.S. at p. ——, fn. 5, 126 S.Ct. at p. 2202, fn. 5 citing *Sanders,* supra, 31 Cal.4th at pp. 331–332, 2 Cal.Rptr.3d 630, 73 P.3d 496.) This language could reasonably be read as approving *Sanders* as a protection against arbitrary parolee searches. *Id.* at 137, 51 Cal.Rptr.3d 430, 146 P.3d 965.

These decisions make it clear that advance knowledge of a parolee's status is critical to the constitutionality of a suspicionless search of a parolee. Thus, before a suspicionless search begins, an officer must have knowledge of the individual's probation or parole status.[3] If the officer learns of this status after the suspicionless search has commenced, the search is in violation of the Fourth Amendment.

3. *Stops and Searches of Parolees and Probationers With Advance Knowledge of Their Parole or Probation Status*

■ Both California and Fourth Amendment law prohibit *all* arbitrary or harassing searches—even of parolees and probationers. The California Supreme Court articulated this rule in *People v. Reyes,* 19 Cal.4th 743, 753–54, 80 Cal. Rptr.2d 734, 968 P.2d 445 (1998):

> [O]ur holding that particularized suspicion is not required in order to conduct a search based on a properly imposed search condition does not mean that parolees have no protection. As explained in *People v. Clower*[, 16 Cal.App.4th

1737, 21 Cal.Rptr.2d 38 (1993) ] (citation omitted), "a parole search could become constitutionally 'unreasonable' if made too often, or at an unreasonable hour, or if unreasonably prolonged or for other reasons establishing arbitrary or oppressive conduct by the searching officer." Accordingly, even when an officer knows the parole or probation status of the subject before beginning the search, that search may still be unconstitutional if the search is made at the "whim or caprice" of the law enforcement officer. *Reyes,* 19 Cal.4th at 754, 80 Cal.Rptr.2d 734, 968 P.2d 445.

A search of a California parolee must not only comport with California law, but—as in all jurisdictions within the Untied States and its territories—with the demands of the federal Constitution as well. *United States v. Crawford,* 323 F.3d 700, 708 n. 4 (9th Cir.2003). In *Samson,* the Supreme Court addressed the legality of arbitrary searches when explaining the limits of its holding:

> The concern that California's suspicionless search system gives officers unbridled discretion to conduct searches, thereby inflicting dignitary harms that arouse strong resentment in parolees and undermine their ability to reintegrate into productive society, is belied by California's prohibition on "arbitrary, capricious or harassing" searches.... The dissent's claims that parolees under California law are subject to capricious searches conducted at the unchecked "whim" of law enforcement officers ... ignores this prohibition.

126 S.Ct. at 2202. Thus, the *Samson* Court relied on the limitation against arbitrary searches in upholding California's system of parolee searches. This reliance indicates that a scheme permitting

---

3. As discussed below in further detail, the officer must also be aware that the probation-

er or parolee is subject to a search condition.

searches conducted at the whim of law enforcement officers would violate the Fourth Amendment. Accordingly, the Court holds that both federal and California law prohibit arbitrary, capricious or harassing searches of all individuals, regardless of their probation or parole status.

#### 4. *Whether the Terms of the Injunction Comport with Current Search and Seizure Law*

Defendants argue that the injunction holds the LAPD to a higher standard than current search and seizure law because "it forbids officers to detain or search persons or property without probable cause or reasonable suspicion of criminal activity or probation or parole violation, regardless of the officers' knowledge of the person's probation or parole status." (Opp. 4:10–15). The Court agrees that the cited language does not accurately reflect current search and seizure standards. However, the injunction provides for the incorporation of changes to search and seizure law: "[s]hould the standard for detention and searches of parolees or probationers be changed by the United States Supreme Court or the Ninth Circuit," then "the injunction will be modified by operation of law accordingly to incorporate the current legal standard." (Richardson Decl., Ex. 2 at 3–4.) Accordingly, the language in the injunction that Defendants argue is contrary to current law has been automatically modified to permit suspicionless searches of parolees—providing, as outlined above, that the officer has advance knowledge of parolee status and that the

search is not arbitrary, capricious, or harassing. In other words, the Court reads the injunction merely as an order that Defendants conduct legal searches of Skid Row residents; it finds nothing in the injunction inconsistent with California or federal search and seizure standards.

#### 5. *Evidence*

The Court now turns to the evidence presented in the parties' papers to determine whether Plaintiffs have met their burden of proving that the LAPD's current practices violate both the terms of the settlement injunction and search and seizure law. Defendants raise several evidentiary objections to Plaintiffs' evidence; Plaintiffs do likewise. Before considering this evidence on the merits, the Court will address some of Defendants' objections.[4]

##### a. *Evidentiary Issues*

As an initial matter, Defendants argue that there is no means of contacting the majority of Plaintiffs' declarants and that this absence of contact information prejudices the Defendants' ability to counter the allegations contained within the declarations. While the Court understands Defendants' concerns about the declarants' availability to testify, the Court notes that many of the declarants are homeless or do not have permanent addresses. The Court is not inclined to bar these declarations merely because the declarants are difficult to contact.

Defendants further argue that two of Plaintiffs' declarants alleged stops did not occur within the geographical area defined by the settlement.[5] Moreover, one decla-

---

**4.** Both Defendants and Plaintiffs have made several generic objections to portions of each others' declarations: hearsay, lack of foundation, lack of personal knowledge, speculation, etc. Without addressing every line of the dozens of declarations submitted, the Court notes that it has reviewed the parties' objec-

tions and will rely only on statements it deems admissible.

**5.** Michael Murphy claims he was stopped at 10th and Los Angeles Streets (Declaration of Michael Murphy ¶ 2); Frank Cesar alleges he was stopped at Stanford between 9th and

ration does not give any date or location for the LAPD encounter.[6] Thus, Defendants argue, these declarations fail to provide support for Plaintiff's contention that LAPD is not honoring the settlement terms. Defendants also argue that these three declarants have no standing to support this motion as Plaintiffs. The Court notes, however, that these declarants are not being proffered as Plaintiffs, but as witnesses. The Court also notes that evidence of potentially illegal searches occurring outside the boundaries of Skid Row does not weigh in Defendants' favor; it arguably provides additional proof that the searches described by Plaintiffs are part of LAPD policy, custom, and practice.[7] Thus, the Court admits these declarations.

Defendants also contend that one of Plaintiffs' declarants, Louis McLeod, misrepresented facts by stating he was not on parole or probation at the time of the alleged search, when he in fact is on summary probation. To prove McLeod's probation status, Defendants have requested that the Court take judicial notice of the criminal docket from *People v. Louis McLeod* BA 259771. (Defs.' Req. for Judicial Notice.) However, whether or not McLeod was actually on probation at the time of the search is irrelevant because his declaration indicates that the officers who allegedly stopped and searched him were unaware of his probation status. (Declaration of Louis McLeod ("McLeod Decl.") ¶¶ 2–9.)

Finally, Defendants also object to the declarations Plaintiffs submitted in conjunction with their Reply—specifically the

declarations of Alice Callaghan and Casey Horan—because they could have been filed with Plaintiffs' original motion. *See, e.g., Lujan v. National Wildlife Fed.*, 497 U.S. 871, 894–95, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). As it appears that most of the information contained in these declarations was available to Plaintiffs at the time they originally filed their motion, the Court will not consider these declarations in deciding the motion.

### b. *Merits*

■ Plaintiffs have submitted the declarations of sixteen search subjects in conjunction with their motion. Although the declarations are not identical, they each tell a similar story: A Skid Row resident[8] (typically a black male) is stopped by LAPD officers patrolling the area on foot or in a police car. The resident contends that he is not engaged in illegal activity. The LAPD officer either: (1) asks him if he is on parole or probation and then begins to search him—even after receiving a negative response; or (2) begins to search him and then asks about his parole and/or probation status during the search. The search lasts between ten and thirty minutes. During the search, the resident is placed in handcuffs and ordered up against a wall. When the search is finished, the resident is released. He is stopped and searched in a similar manner several times over the following months.

Defendants have also submitted several declarations in opposition to the motion. Several are made by police officers assigned to the Skid Row area. These offi-

---

10th streets. (Declaration of Frank Cesar ¶ 4.)

6. The Declaration of Berisford D. Willoughby, Jr. does not give any date or location for his alleged encounter with LAPD officers.

7. As one of Defendant's declarants indicates, it is possible that the boundaries of Skid Row

have changed in the past three years. (Declaration of Greg McManus ¶ 8.) Therefore, the injunction may need to be modified to account for that change.

8. The Court uses the term "resident" to include those declarants who are homeless and those who primarily reside in Skid Row shelters.

cers claim that they are trained to search individuals only when: (1) they have probable cause to effectuate an arrest; (2) when they can articulate facts, based upon a totality of the circumstances; (3) that the person consents to the search during a lawful consensual encounter; or (4) when the officer is aware the person is on probation or parole. They deny that any behavior similar to that described by Plaintiffs would have occurred, and emphasize that the officers are trained to handle encounters with Skid Row residents in a non-confrontational manner. Defendants have also submitted several declarations from individuals who own businesses or work on Skid Row. These individuals claim that the officers who work in the Skid Row area are extremely helpful to Skid Row residents. They also claim that, as a result of the Safer Cities Initiative, Skid Row is safer and cleaner.

In essence, Plaintiffs' evidence and Defendants' evidence tell two different stories about the searches that occur on Skid Row. Although the Court may find certain accounts more plausible than others, it cannot say, as a matter of law, that one version of the facts must be believed over the other. During oral argument, however-

er, Plaintiffs identified certain portions of Defendants' evidence which they contend demonstrate, as a matter of law, that Defendants have violated the injunction on at least a few occasions. The Court will now address those specific pieces of evidence to determine whether, even viewing the evidence in the light most favorable to Defendants, violations of the settlement and the law have in fact occurred.[9]

### 1. *Detention of Paul Johnson*

Plaintiffs argue that Defendants have conceded that Declarant Paul Johnson was detained unconstitutionally. In support of this argument, Plaintiffs point to the declaration of Officer Sucha Singh, the patrol officer who detained Paul Johnson. In his declaration, Officer Singh states that he was working Central Division patrol when he "came upon a Paul Johnson." He does not recall why he stopped Paul Johnson: "At this time, I cannot independently recall the basis for detaining Paul Johnson. However, I cannot and would not place an individual up against a wall without a legal basis for doing so."[10] (Declaration of Sucha Singh ("Singh Decl.") ¶ 3.) Singh states that he ran Mr. Johnson's name for wants and warrants on the Mobile Digital Terminal. (*Id.*) When a possible felony

---

9. In conducting this analysis, the Court is only addressing certain arguments made in the papers. Both parties make several other credibility and policy arguments in support of their motion. The Court does not discount these arguments; it merely intends to resolve this motion based on the undisputed evidence it has before it.

10. In his declaration, Paul Johnson describes the incident as follows:

> About two weeks ago, I was walking on 6th Street near San Pedro when two LAPD officers in a car stopped me. They pulled up alongside me and one of them yelled out of the window, "Are you on probation or parole?" I am not on probation or parole, and I told him so. Then I asked why he asked me and said that he couldn't ask anybody that question. They told me to get

up against the wall. I did so, and they handcuffed me. They asked my name, and I gave it to them. While they ran my name, they searched me. They put their hands in my pockets and took the stuff in my pockets to examine it. When my name came back and showed I wasn't on probation or parole, they said they didn't believe it was my real name. They told me, "Everybody down here is on probation or parole." They put me in the back of the car and took me in to the Police Station at 6th and Wall. I was handcuffed to a bench for between thirty minutes and one hour at the station, then they let me go without issuing me any kind of citation. I had been handcuffed on the street for about half an hour while they searched me and ran my name.

(Declaration of Paul Johnson, ¶ 4.)

warrant was revealed for the name "Paul Johnson," Singh transported him to Central Division for further investigation.[11] (*Id.* ¶ 4.) After Singh determined that the warrant did not belong to the Paul Johnson he had detained, he released him. (*Id.*)

Singh has stated that he cannot currently recall the basis for detaining Paul Johnson. Plaintiffs argue that, pursuant to the Ninth Circuit decision in *Dubner v. City and County of San Francisco*, 266 F.3d 959 (9th Cir.2001), Defendants have undeniably failed to meet their burden of production on the issue of whether the warrantless arrest of Paul Johnson was in fact lawful. In *Dubner*, the court explained the burden-shifting analysis on the issue of unlawful arrests:

> Although the plaintiff bears the burden of proof on the issue of unlawful arrest, [he] can make a prima facie case simply by showing that the arrest was conducted without a valid warrant. At that point, the burden shifts to the defendant to provide some evidence that the arresting officers had probable cause for a warrantless arrest. The plaintiff still has the ultimate burden of proof, but the burden of production falls on the defendant. If the defendant is *unable* or refuses to come forward with any evidence that the arresting officers had

probable cause *and the plaintiff's own testimony does not establish it,* the court should presume the arrest was unlawful. *Dubner,* 266 F.3d at 965 (internal citations omitted) (emphasis added).

It is clear from Singh's declaration that he did not have a warrant for Paul Johnson's arrest.[12] Therefore, under *Dubner,* the burden shifts to Defendants to provide some evidence that Singh had probable cause to arrest Johnson. Singh's declaration reveals that he cannot independently recall the basis for detaining Paul Johnson. Moreover, Defendants did not produce any additional evidence indicating a basis for stopping Johnson or for bringing him to Central Station. Finally, Johnson's own testimony (see footnote two *supra*) does not establish probable cause for the search. Accordingly, even viewing the evidence in the light most favorable to Defendants, the Court must presume that the detention of Paul Johnson was unconstitutional.

### 2. Los Angeles Municipal Code ("LAMC") Section 41.18(d)

Plaintiffs also argue that the only evidence of criminal activity that Defendants have submitted to justify the detentions and searches are the alleged violations by declarants Chester Cox and Shawn Robertson of LAMC 41.18(d).[13]

---

**11.** There has been no evidence that the description of Paul Johnson associated with the possible felony warrant was a match for the Paul Johnson detained by Officer Singh.

**12.** Singh's and Johnson's declarations indicate that the detention of Paul Johnson was not an investigatory stop but rather a custodial arrest. Singh placed Johnson in handcuffs and transported him to Central Station. The objective circumstances of being placed in handcuffs and transported to a police station would cause a reasonable innocent person to believe that he was not free to leave. *See, e.g., United States v. Bravo,* 295 F.3d 1002, 1009 (9th Cir.2002). Accordingly, Singh needed probable cause to arrest Johnson. *Pierce v.*

*Multnomah County,* 76 F.3d 1032, 1038 (9th Cir.1996).

**13.** LAMC § 41.18(d) provides:

> No person shall sit, lie or sleep in or upon any street, sidewalk or other public way.
> The provisions of this subsection shall not apply to persons sitting on the curb portion of any sidewalk or street while attending or viewing any parade permitted under the provisions of Section 103.111 of Article 2, Chapter X or this Code; nor shall the provisions of this subsection supply [sic] to persons sitting upon benches or other seating facilities provided for such purpose by municipal authority or permitted by this Code.

In his declaration, Officer David Azevedo gives the following account of his detention of Shawn Robertson:

> On November 26, 2006, I and my partner Officer Issa were working bike patrol assigned to Safer Cities Task Force in Central Division.
>
> At approximately 9:20 a.m., I and my partner were patrolling Crocker near 5th Street. We conducted a pedestrian stop of an individual by the name of Shawn Robertson. Mr. Robertson was either sitting, lying, or sleeping on the sidewalk. We began an investigation for a possible violation of [LAMC § 41.18(d) ] which prohibits people lying, sleeping, or sitting upon any street, sidewalk, or other public way.
>
> Based on Mr. Robertson's possible violation of LAMC 41.18(d), we ran a check for wants and warrants over the radio. No wants or warrants came back for Mr. Robertson. The total time of our investigation was approximately 5–10 minutes.
>
> Based on the lack of wants or warrants for Mr. Robertson, we verbally warned him against violating LAMC § 41.18(d). We did not cite Mr. Robertson for violating LAMC § 41.18(d).

(Declaration of David Azevedo ("Azevedo Decl.") ¶¶ 2–5.)

Officer Donna Shoates gives a very similar account of her detention of Chester Cox:

> On December 1, 2006, I was working the mounted patrol on horseback assigned to work Central Division, specifically within the geographic area of the Safer Cities Initiative....
>
> At approximately 4:00 p.m., I and my partner were patrolling the area around 6th and San Julian Streets, near the Union Rescue Mission. We conducted a pedestrian stop of an individual with the name of Chester Cox. Mr. Cox was not standing on the sidewalk. He was either sitting, lying, or sleeping on the sidewalk. We began an investigation for a possible violation of [LAMC § 41.18(d) ] which prohibits people lying, sleeping, or sitting upon any street, sidewalk, or other public way.
>
> Based on Mr. Cox's violation of LAMC § 41.18(d), we ran a console check to determine whether there were any outstanding wants or warrants for him at 15:49 hours or at 3:49 p.m. A console check is a request in the field with dispatch to look for an individual's parole or probation status or whether any outstanding warrants exist for an individual. No wants or warrants came back for Mr. Cox. The total time of our investigation was 15 minutes....
>
> Based on the lack of wants or warrants for Mr. Cox, we verbally warned him against violating LAMC § 41.18(d). We did not cite Mr. Cox for violating LAMC § 41.18(d).

(Declaration of Donna Shoates ("Shoates Decl.") ¶¶ 2–5.)

---

Interestingly, the Ninth Circuit has recently held, with respect to § 41.18(d), that "just as the Eighth Amendment prohibits the infliction of criminal punishment on an individual for being a drug addict ... [it] prohibits the City from punishing involuntary sitting, lying, or sleeping on public sidewalks that is an unavoidable consequence of being human and homeless without shelter in [ ] Los Angeles." *Jones v. City of Los Angeles*, 444 F.3d 1118, 1138 (9th Cir.2006). The challenge in *Jones,* however, was not a facial challenge to § 41.18(d); the plaintiffs in that case made an "as-applied" challenge to the nighttime enforcement of 41.18(d), arguing that sleeping on the sidewalk becomes an essentially "involuntary" act for the homeless at night. The Court does not resolve here whether § 41.18(d) is facially unconstitutional; it merely notes that its constitutionality appears dubious.

As an initial matter, the Court notes that neither officer states that Cox or Robertson were, in fact, sitting, sleeping, or lying on the sidewalk; rather, they both state that the declarants were *"either"* sitting, sleeping, or lying on the sidewalk. The fact that neither officer directly states exactly *how* Cox or Robertson were violating § 41.18(d) casts doubt on whether the officers independently recall the incidents. Accordingly, pursuant to *Dubner*, the Court will not credit their accounts where they diverge from Cox's and Robertson's.

The Court also notes that Officer Azevedo does not indicate whether he actually searched Robertson. This is curious considering that Robertson describes being handcuffed and searched by Azevedo's partner in his declaration.[14]

Finally, the Court notes that Azevedo's declaration describes stopping a Mr. Robertson on November 26, 2007. By contrast, the Mr. Robertson who filed a declaration in this case describes a search that occurred on Wednesday, November 29, 2007. Thus, it is possible that the search described by Azevedo did not involve the Mr. Robertson who filed a declaration.

Assuming that the Azevedo did search Robertson for violating § 41.18(d), it is relatively clear that those searches were unconstitutional. The United States Supreme Court has noted that police may not conduct a search based on probable cause to believe a crime has been committed when no physical evidence exists for that crime. *See Knowles v. Iowa*, 525 U.S. 113, 118, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) ("Once Knowles was stopped for speeding and issued a citation, all the evidence necessary to prosecute that offense had been obtained. No further evidence of excessive speed was going to be found either on the person of the offender or in the passenger compartment of the car."). There is no physical evidence necessary to prove a violation of § 41.18(d). Therefore, even presuming that the declarants were violating § 41.18(d), it was unconstitutional to search them in connection with that offense.

Additionally, Azevedo specifically stated that he "did not cite Mr. Robertson for violating LAMC § 41.18(d)." (Azevedo Decl. ¶ 5.) Accordingly, Plaintiffs argue that Defendants cannot justify the search of Robertson as a "search incident to an arrest" because Azevedo did not arrest Robertson. In *Menotti v. City of Seattle*, 409 F.3d 1113, 1153 (9th Cir.2005), the Ninth Circuit addressed whether a warrantless search or seizure could be justified as a "search incident to arrest" where no arrest was made:

> Smith contends that his seizure of Skove's sign was lawful because Smith

---

14. While Cox claims that the Shoates only stopped him and ran his name for warrants (Declaration of Chester Cox ¶ 5), Robertson states that he was handcuffed and searched:

> On November 29, 2006, I was packing up my tent on Crocker between 5th and 6th, by Emmanuel Baptist Mission, because 7:30 a.m., when I approached by two LAPD officers on bicycles—a man and a woman who were both white. I was standing by my tent when they approached. The first thing the officers said to me was to tell me to step over to the wall and place my hands on top of my head. The woman told me that, then she took my hands and handcuffed me behind my back. As I was being handcuffed, they asked me whether I was on probation or parole. I told them I was not.... After I told the officers I was not on probation or parole, the woman officer searched my person—patted me down and looked in my pockets—and searched my tent and possessions. While she was searching, the male officer ran my name by calling it over the radio. The woman officer didn't find anything so she released me from the handcuffs. I was handcuffed for about twenty minutes.

(Declaration of Shawn A. Robertson, III ("Robertson Decl.") ¶¶ 2–7.)

had probable cause to arrest Skove for being in the restricted zone and not within Order No. 3's exemptions. We agree that Smith had probable cause to arrest Skove because, by engaging in protest inside the restricted zone without evidence that he was exempt, Skove had violated Order No. 3. However, it is uncontested that Smith did not arrest Skove. Had Skove been arrested, ample precedent would permit a search or seizure "incident to arrest." We decline to extend to doctrine of "search incident to arrest" to give protection for a warrantless search or seizure when no arrest is made.... Whatever Officer Smith's reason for not making the arrest, the seizure cannot be justified as incident to an arrest. Had an arrest been made,

The Ninth Circuit also explained the policy considerations of its reasoning:

There is some merit to the argument that where there is probable cause to arrest, evidence of the crime may be seized and the seizure considered valid even if the arrest is not completed.... Yet, we reject this position because, if police aims to arrest are so weak that they do not detain a suspect, then it seems incongruous to say that a seizure of evidence can be lawfully made without a warrant. We decline to extend the exception to warrant requirements for seizures incident to arrest to instances in which a police officer seizes evidence of a crime, but makes no arrest.

*Id.*

As in *Menotti*, Azevedo did not arrest Robertson. Therefore, Azevedo's stop of Robertson for § 41.18(d) cannot have provided grounds for the full search of Rob-

ertson and his belongings that Robertson alleges occurred and that, pursuant to *Dubner*, this court must believe occurred. Thus, even viewing the evidence in the light most favorable to Defendants, the Court finds that Plaintiffs have met their burden of proving that certain unconstitutional searches and seizures occurred.

### 3. Whether California Law Permits Suspicionless Searches of All Parolees or of Any Probationers

Plaintiffs argue that California law prohibits suspicionless searches of *all* probationers. Plaintiffs also argue that California law prohibits suspicionless searches of *some* parolees. Because Plaintiffs contend that Defendants have admitted they have a policy of conducting suspicionless searches of any individual who they know to be on probation or parole, Plaintiffs believe that Defendants have admitted to an unconstitutional policy.

In *Samson*, the question before the Supreme Court was whether a suspicionless search, conducted under the authority of [California Penal Code § 3067(a)], violated the United States Constitution. *Samson*, 126 S.Ct. at 2196. In holding that it did not, the Court accounted for the California Legislature's § 3067(a) requirement that every prisoner eligible for release on state parole in California "shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." *Id.* at 2199. The Court considered the mandatory search condition for parolees as a factor that weighed in favor of its finding that the suspicionless search of the California parolee did not violate the Fourth Amendment.[15] *Id.*

**15.** Notably, the *Samson* court did not reach the issue whether acceptance of the search condition by the parolee constituted consent in the sense of a complete waiver of Fourth Amendment rights. *Id.* at 2199 n. 3. The Court

observed that the California Supreme Court had not yet addressed the issue and that is was unclear whether the State had raised the consent theory in the lower courts. *Id.*

Because the *Samson* court relied on § 3067 to justify its holding, this Court has examined the California Penal Code to determine what the California Legislature actually requires of parolees and probationers. As noted above, § 3067 addresses parole. Read in isolation, § 3067(a) imposes a mandatory search condition on all parolees. However, § 3067(c) states that the mandatory search provisions of § 3067(a) only apply to those "eligible for release for an offense committed on or after January 1, 1997." Thus, the statutory authority to conduct suspicionless searches of parolees does not automatically apply to those on parole for a crime committed before 1997.

■ Probation is addressed in a separate statute, California Penal Code § 1203.1. In contrast to § 3067, § 1203.1 does not impose an explicit search condition on probationers. Instead, it gives trial judges discretion to impose probation conditions. *See generally* § 1203.1.

Thus, on its face, § 1203.1 does not impose a mandatory search condition on all probationers. Defendants contend, however, that California case law expressly permits suspicionless probationary searches of all probationers. Plaintiffs argue that this contention is not true and that Defendants overstate and mischaracterize the authority on which they rely: *People v. Reyes*, 19 Cal.4th 743, 80 Cal.Rptr.2d 734, 968 P.2d 445 (1998), *People v. Woods*, 21 Cal.4th 668, 88 Cal.Rptr.2d 88, 981 P.2d 1019 (1999), *People v. Sanders*, 31 Cal.4th 318, 333–35, 2 Cal.Rptr.3d 630, 73 P.3d 496 (2003), and *In re Jaime P.*, 40 Cal.4th 128, 51 Cal.Rptr.3d 430, 146 P.3d 965 (2006).

The Court now turns to these cases to resolve the dispute. In 1998, the California Supreme Court decided *Reyes*. The *Reyes* court did not discuss the permissibility of suspicionless searches of probationers generally; rather, it held that "particularized suspicion is not required in

order to conduct a search based on a properly imposed search condition." *Reyes*, 19 Cal.4th at 753, 80 Cal.Rptr.2d 734, 968 P.2d 445. One year later, in *Woods*, the California Supreme Court explained that "[i]n California, probationers may validly consent in advance to warrantless searches in exchange for the opportunity to avoid service of a state prison term." *Woods*, 21 Cal.4th at 674–75, 88 Cal.Rptr.2d 88, 981 P.2d 1019. The *Woods* court upheld a suspicionless search of the probationer, but specifically noted that "in all cases, a search pursuant to a probation search clause ·*may not exceed the scope of the particular cause relied on.*" *Id.* at 682, 88 Cal.Rptr.2d 88, 981 P.2d 1019. (emphasis added).

In 2003, the California Supreme Court revisited this issue in *Sanders:*

> We recognized in *Reyes* that whether the parolee has a reasonable expectation of privacy is inextricably linked to whether the search was reasonable. A law enforcement officer who is aware that a suspect is on parole and subject to a search condition may act reasonably in conducting a parole search even in the absence of a particularized suspicion of criminal activity, and such a search does not violate any expectation of privacy of the parolee.... But our reasoning in Reyes does not apply if the officer is unaware that the suspect is on parole and subject to a search condition. Despite the parolee's diminished expectation of privacy, such a search cannot be justified as a parole search, because the officer is not acting pursuant to the conditions of parole.

*Id.* at 333, 2 Cal.Rptr.3d 630, 73 P.3d 496. With respect to suspicionless probationer searches, the Court also noted that "if an officer is unaware that a suspect is on probation *and subject to a search condition,* the search is not justified by the

state's interest in supervising probationers or by the concern that probationers are more likely to commit criminal act." *Id.* (emphasis added). The *Sanders* court held that the otherwise unlawful search of the residence of an adult parolee may not be justified by the circumstance that the suspect was subject to a search condition of which the law enforcement officers were unaware when the search was conducted. *Id.* at 335, 2 Cal.Rptr.3d 630, 73 P.3d 496.

Finally, on November 30, 2006, the California Supreme Court in *In re Jaime P.* reiterated and clarified its position on suspicionless searches in light of the *Samson* decision. The Court overruled its earlier decision in *In re Tyrell J.*, 8 Cal.4th 68, 32 Cal.Rptr.2d 33, 876 P.2d 519 (1994) that an officer's prior knowledge of a probation condition was not necessary in a juvenile case. *In re Jaime P.*, 40 Cal.4th at 139, 51 Cal.Rptr.3d 430, 146 P.3d 965. In so doing, the Court observed that "*Samson* involved a *parolee* search conducted by officers *aware* of the parolee's consent-to-search condition." *Id.* at 136, 51 Cal. Rptr.3d 430, 146 P.3d 965. The Court further noted that "*Samson* appears to support [the] view that the high court approves of our Sanders holding requiring prior knowledge of the search condition as a protection against harassing searches." *Id.* at 137, 51 Cal.Rptr.3d 430, 146 P.3d 965. Thus, the Court concluded, where an arresting officer has neither reasonable suspicion of any criminal activity nor advance knowledge of a search condition that might justify a search, the officer's search is not justified. *Id.* at 139, 51 Cal.Rptr.3d 430, 146 P.3d 965.

In sum, it is clear from the case law that Defendants are incorrect: the California Supreme Court *has not* endorsed all suspicionless probationary searches. Instead, the California Supreme Court has explicitly and repeatedly held that an officer conducting a suspicionless search of an adult must be aware of a search condition before conducting the search. Accordingly, if, as Plaintiffs argue, Defendants have in fact admitted a policy of searching all probationers based on their probationer status alone, then they have admitted to an unconstitutional policy.

Here, there is evidence that Defendants have a policy of searching Skid Row residents when they are aware of their parolee or probationer status. Defendants have submitted the declaration of Michael O'Donnell, the LAPD officer assigned as the "Officer in Charge of Central Area Safer Cities Initiative." (Declaration of Michael O'Donnell ("O'Donnell Decl.") ¶ 1.) O'Donnell's duties include directing the activities of the officers assigned to the Safer Cities Initiative and providing training to officers in the field. (O'Donnell Decl. ¶¶ 1–2.) In describing officer training on constitutional searches, O'Donnell states the following:

> Officers are trained that they may search individuals when, among other situations, (1) they have probable cause to effectuate an arrest, (2) they can articulate facts, based upon a totality of the circumstances, that the person may be armed with a weapon, (3) the person consents to the search during a lawful consensual encounter, or (4) *when they are aware the person is on probation or parole.*

(O'Donnell Decl. ¶ 5.) (emphasis added). This is a direct admission, from the Officer in Charge of the Safer Cities Initiative, that Defendants have a policy of searching Skid Row residents solely on the basis of the resident's parolee or probationer status without knowledge of any search conditions imposed. The law does not allow such searches. Accordingly, the Court finds that, even viewing the evidence in the light most favorable to Defendants, they have admitted to an unconstitutional policy.

## III. CONCLUSION

Based on the evidence submitted by the parties, the Court finds that Plaintiffs have established that some violations of the injunction have occurred and are likely still occurring. In light of this evidence, the Court grants the motion to extend the injunction for a period of four months (120 days) from the issuance of this order. This should provide the LAPD ample time to review its policies and practices to ensure that they comply with current Fourth Amendment law as outlined in this order.

If, at the end of the four month period, Plaintiffs believe that violations of the injunction are still occurring, they may move for another extension of the injunction and the Court will consider their evidence. Similarly, if Defendants believe that there is cause to vacate the injunction before the four month period has expired, they may move accordingly.

IT IS SO ORDERED.